**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **STEPHEN D. LAWSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05 C 5290** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | **Magistrate Judge Michael T. Mason** |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Stephen D. Lawson ("Plaintiff"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA"). The Commissioner denied Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II and his claim for Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act (the "Act"). The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g) and 1383(c)(3). For the reasons set forth below, Plaintiff's motion for summary judgment is granted in part and denied in part, the Commissioner's motion is denied and this case is remanded for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

This case has a long procedural history that encompasses three ALJ decisions, an Appeals

Council remand, and a remand by the district court. Plaintiff applied for DIB and SSI on January 28, 1994, alleging that he became disabled as of October 3, 1993, due to ruptures of the patella tendons (i.e., knee injuries) in both of his legs. (R. 147, 295-302).[1] Plaintiff's applications for benefits were initially denied on April 1, 1994 (R. 147-51) and, denied again, on reconsideration, on May 13, 1994. (R. 153-58). Plaintiff then filed a request for an administrative hearing (R. 162-63) and, on February 12, 1996, ALJ Richard A. Palewicz held an administrative hearing.[2] (R. 43-89).

ALJ Palewicz subsequently issued a partially favorable decision on July 26, 1996, awarding benefits to Plaintiff for a "closed period" of disability from October 3, 1993 through January 20, 1996, but not thereafter. (R. 341-43, 345-54). ALJ Palewicz specifically addressed Plaintiff's medical need to elevate his leg at work and concluded that he could elevate his right leg during breaks and lunch periods. (R. 451). Thus, ALJ Palewicz found that after January 20, 1996, Plaintiff's disability had ended because he regained the ability to perform the full range of sedentary work. (*Id*).

On February 6, 1998, the Appeals Council vacated the unfavorable portion of ALJ Palewicz's decision and remanded the matter to a second ALJ, Steven H. Templin, for further consideration of Plaintiff's disability status as of January 21, 1996. (R. 15-35, 365-68). ALJ Templin held an administrative hearing on January 11, 1999 (R. 90-146) and issued an unfavorable decision on January 25, 2000, finding that Plaintiff was not disabled for the period beginning January 21, 1996 because he had medically improved; therefore, he could have performed most sedentary and some

---

[1]References are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

[2]ALJ Palewicz originally convened a hearing on December 18, 1995; however, no testimony was taken. (R. 36-42).

light work despite his impairments. (R.12-35, 452). The Appeals Council subsequently denied Plaintiff's request for review on July 19, 2001. (R. 6-7, 10-11).

Plaintiff sought judicial review pursuant to 42 U.S.C. § 405(g) and U.S. Magistrate Judge Morton Denlow remanded the case to the Commissioner. (R. 593). Magistrate Judge Denlow remanded the case to determine whether Plaintiff's pain and swelling required a sporadic elevation of his right leg or whether his pain and swelling could be accommodated with a scheduled elevation of his leg at regular work breaks. (R. 452, 591). On remand, Magistrate Judge Denlow further ordered that Plaintiff's credibility be reassessed. (R. 590-91).

On remand from the district court, a third ALJ, Helen Cropper, held an administrative hearing on September 14, 2004. (R. 599-683). Plaintiff and a Vocational Expert ("VE") testified at the administrative hearing. (R. 621-80). ALJ Cropper issued an unfavorable decision on September 30, 2004, finding that Plaintiff was not disabled because he had medically improved and his disability ended as of January 20, 1996. (R. 448-71). On July 16, 2005, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (R. 435-38). Pursuant to 42 U.S.C. § 405(g), Plaintiff again initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

### I.     MEDICAL EVIDENCE

On October 3, 1993, Plaintiff sustained bilateral patellar tendon ruptures (i.e., knee injuries) while playing semi-professional football. (R. 191-92, 454). He underwent surgery (R. 192) and subsequently sustained persistent bacterial infections of his right knee. (R. 210-11, R. 454).

Dr. Boone Brackett, M.D., an orthopedic surgeon, performed Plaintiff's surgery in 1993 and

treated him through 1999.[3] (R. 262-72, 276-94, 415-17, 427). On March 30, 1995, Dr. Brackett treated Plaintiff and noted that his range of motion was limited and he experienced some pain and swelling in his right knee and calf area. (R. 334). At that time, Dr. Brackett's progress notes indicated that he was "[t]rying to get some sit-down work" for Plaintiff. (*Id*). On October 3, 1995, Dr. Brackett treated Plaintiff and indicated that he could do light duty, sit-down work, if such work was available. (R. 417).

Plaintiff saw Dr. Brackett for an office visit on January 25, 1996. (R. 417). Dr. Brackett noted that Plaintiff's range of motion was better and he was getting "better strength" in his right knee. (*Id*). He reported that Plaintiff was "doing reasonably well" and "could do sedentary work." (*Id*).

In January of 1996, Dr. Brackett assessed Plaintiff's condition and completed a form entitled "Medical Assessment Of Ability To Do Work-Related Physical Activities." (R. 326-28). At that time, Dr. Brackett reported that Plaintiff could sit for two hours at one time in an eight-hour workday and for a total of seven hours in an eight-hour workday. (R. 326). He opined that Plaintiff was limited in his ability to lift and carry items and could not squat, crawl, or climb. (R. 327-28). Dr. Brackett noted that Plaintiff needed to elevate his right leg for fifteen to thirty minutes, three times a day in order to control pain and swelling in his leg. (R. 326, 328).

Plaintiff saw Dr. Brackett for an office visit on May 19, 1997. (R. 416-17). At that office visit, Plaintiff complained of knee pain and reported that he occasionally takes Ultram (a narcotic pain reliever used to treat moderate to severe pain) for the "significant pain" he experiences. (R. 416). Dr. Brackett noted that an X-ray evaluation of Plaintiff's right knee showed calcification within

---

[3]Plaintiff underwent extensive physical therapy from October of 1993 through November of 1994. (R. 230-34, 240-61).

the tendon and some calcific densities about the knee; however, his knee had not "changed dramatically" as indicated by a previous X-ray evaluation done in 1994. (*Id*). He indicated that Plaintiff's patellar grinding and apprehension tests were negative and he was walking "quite well," but had a slight limp. (*Id*). Dr. Brackett further noted that Plaintiff worked with foster children and was "quite active and agile" in performing this activity. (*Id*).

Dr. Irwin I. Feinberg, M.D., performed an orthopaedic consultative examination of Plaintiff on July 6, 1998. (R. 369-71). Plaintiff reported that he continued to have swelling of his right knee and experienced instability which was coupled with pain and loss of motion. (R. 369). Upon examination, Dr. Feinberg found that Plaintiff had various abnormalities of his right knee which included a reduced range of motion of the right knee (i.e., twenty degrees out of a possible one-hundred and eighty degrees), mild vargus in the knees, loss of right parapatellar contours (swelling around the kneecap), and a right quadriceps that was two inches larger than the left quadriceps. (R. 117, 370-71, 374). Dr. Feinberg noted that Plaintiff experienced chronic swelling in his right knee, but that he took no medications and walked with a normal gait. (R. 370-71, 374). He further indicated that Plaintiff's impairment affected his lifting, carrying, standing and walking abilities, but not his ability to sit.[4] (R. 372, 374). Dr. Feinberg opined that Plaintiff could occasionally lift and/or carry up to thirty pounds and could frequently lift and/or carry up to fifteen pounds in an eight-hour workday.[5] (R. 372).

---

[4] Dr. Feinberg did not specify the number of hours in an eight-hour workday that Plaintiff was capable of sitting and/or standing. (R. 374). He indicated that Plaintiff's ability to sit was not affected by his impairment. (*Id*).

[5] Dr. Feinberg noted that Plaintiff weighed three hundred and forty pounds at the time of the examination. (R. 370).

On March 9, 1999, Dr. Brackett responded by letter to three questions posed by Plaintiff's previous attorney regarding Plaintiff's condition. (R. 391-92). In the letter, Dr. Brackett reported that Plaintiff had sustained bilateral patellar tendon ruptures as well as a quadriceps rupture on his right leg which constituted a serious and potentially disabling injury. (R. 391). He indicated that the continued presence of swelling of Plaintiff's right leg was related to the injury and that it was not unusual for there to be persistent asymmetry in Plaintiff's thighs (i.e., his right thigh was larger than his left thigh) after such an injury. (*Id*). Dr. Brackett further noted that he would need to examine Plaintiff in order to determine whether he still needed to elevate his right leg for fifteen to thirty minutes, three times a day, to control his pain and swelling.[6] (R. 391-92).

Plaintiff underwent a consultative examination with Dr. Leonard R. Smith, M.D., an orthopaedic surgeon, on March 11, 1999. (R. 395-96). At that time, Plaintiff reported that he sustained bilateral knee injuries on October 3, 1993 while playing football which necessitated three surgeries on his right knee (two which were due to infections) and one surgery on his left knee.[7] (R. 395). He indicated that he was bedridden for eight months, and had used a wheelchair and then a walker.[8] (*Id*). Plaintiff further reported that he had difficulty sitting for long periods of time and experienced stiffness and cramping at times. (*Id*). He indicated that he was unable to run, had difficulty going up and down stairs, and was limited in squatting and kneeling. (*Id*). Plaintiff stated

---

[6]In a March 9, 1999 letter, Dr. Brackett stated that "It is entirely possible that by this time the medical need to continue such elevation may have passed." (R. 392). He further indicated that he would need to examine Plaintiff in order to make that determination. (*Id*).

[7]Dr. Smith noted that it was also necessary to manipulate Plaintiff's knees. (R. 395).

[8]Dr. Smith noted that Plaintiff had had crutches and a cane, which he used at times. (R. 395).

that his medications included muscle relaxants and his right knee was not stable. (*Id.*). He also indicated that he had some pain and loss of motion in both knees. (*Id.*).

Upon examination, Dr. Smith found tenderness in the right infrapatellar area, moderate loss of the normal hollow landmarks of the right knee and some loss of normal hollow landmarks on the left knee. (R. 396). He determined that Plaintiff's extension on the right was limited at ten degrees (out of a possible one-hundred and eighty degrees) and his flexion was limited at forty-five degrees (out of a possible one-hundred and thirty-five degrees). (*Id.*). Dr. Smith noted that the circumferences of Plaintiff's right knee and calf were larger than his left knee and calf. (*Id.*). He also reported that an X-ray evaluation of Plaintiff's right knee showed severe degenerative changes with patella alta. (*Id.*). Dr. Smith noted that Plaintiff's left knee was better than his right knee, but it still exhibited some residual limitation of motion and muscle weakness. (*Id.*). He opined that Plaintiff's problems were severely complicated by his obesity and "functional improvement could be anticipated if he reduced to a more optimal weight." (*Id.*).

Dr. Smith completed a Physical Residual Functional Capacity Assessment form on March 11, 1999 and opined that Plaintiff could lift and/or carry up to twenty pounds occasionally and ten pounds frequently. (R. 398). He indicated that Plaintiff could stand and/or walk at least two hours in an eight-hour workday and could sit, but he must periodically alternate between sitting and standing in order to relieve his pain or discomfort. (*Id.*). Dr. Smith further noted that Plaintiff was limited in his pushing and/or pulling abilities with regard to his lower extremities, could never climb, balance or squat, and could occasionally stoop, kneel and crouch. (R. 398-99). He also indicated that Plaintiff must avoid all exposure to hazards. (R. 401).

On March 22, 1999, Plaintiff saw Dr. Brackett for an office visit. (R. 416). At that office visit, Plaintiff complained of right calf swelling and that he was not able to fully flex or extend his right knee. (*Id.*). Dr. Brackett noted that Plaintiff's "patella [was] off on both sides" and indicated he may need to have a total knee arthroplasty. (*Id.*). He prescribed Indocin (nonsteroidal anti-inflammatory medication) and glucosamine chondroitin (medication used to treat moderate to severe knee pain in osteoarthritis patients) as well as exercises to improve his condition. (*Id.*).

Plaintiff was treated by Dr. Brackett on April 19, 1999. (R. 416). As of that date, Dr. Brackett noted that Plaintiff's range of motion in his right knee was ninety degrees and he was able to lift his right leg while straightened. (R. 415). He reported that, with respect to Plaintiff's extension on his right leg, he "may still have a little hamstring contracture maybe 2-3 [degrees]"; however, his extension was very close to zero degrees. (*Id.*). Dr. Brackett noted that Plaintiff was taking Ultram and glucosamine chondroitin and he encouraged him to try to lose weight. (*Id.*).

On May 3, 1999, Plaintiff saw Dr. Brackett for an office visit. (R. 415). Dr. Brackett noted that Plaintiff's range of motion was good and he was continuing to lose weight. (*Id.*). He reported that Plaintiff was able to lift his right knee "straight with about 90 [degrees], only 2-3 [degrees] short of full extension and [he] comes past 90 [degrees] which is miraculous." (*Id.*). Dr. Brackett indicated that Plaintiff was taking the prescribed medication and seemed to be somewhat better. (*Id.*). He noted that Plaintiff had a significant amount of arthritis and was anxious to have a right knee replacement.[9] (R. 415). Dr. Brackett further reported that Plaintiff "[c]ould be working." (*Id.*).

Dr. Brackett sent Plaintiff's previous attorney a letter dated October 8, 1999, indicating that

---

[9]Dr. Brackett noted that he wanted to hold off the right knee replacement surgery. (R. 415).

the last time he examined Plaintiff was on June 14, 1999. (R. 427). Dr. Brackett noted that Plaintiff still had swelling in his right calf, but he showed no signs of venous distension. (*Id.*). Dr. Brackett opined that Plaintiff "would be best served by elevating his leg in the manner which was necessary in 1996." (*Id.*). Thus, Plaintiff would need to elevate his right leg for fifteen to thirty minutes, three times a day in order to control pain and swelling in his leg. (R. 326, 328, 427).

Dr. James Elmes, M.D., performed an orthopedic consultative examination of Plaintiff on November 4, 2003. (R. 489-500). At that time, Plaintiff reported that he had a clicking sensation associated with pain in his right knee as well as buckling, locking, swelling, and lateral pain. (R. 489). He indicated that the intensity of his pain ranged from a four (best days) to a ten (worst days) on a scale of zero to ten with ten being the most severe pain. (R. 489). Plaintiff further stated that his pain had slowly been increasing over the past six months and his pain was aggravated with weather changes. (R. 489-90). He reported that when he twisted or pivoted he got sharp pain which sometimes radiated to four inches below his right knee and that lifting, bending, twisting, and direct pressure increased his pain. (R. 490). Plaintiff indicated he had some weakness of his right leg with distance walking and had difficulty with balance due to weakness in his right knee. (*Id.*).

Upon examination, Dr. Elmes found that Plaintiff's motor strength in his right lower extremity was reduced by twenty percent and that he had slightly larger circumference measurements of his right thigh, knee and calf as compared to his left side. (R. 491). He noted that Plaintiff's X-ray evaluations *inter alia* indicated about ten degrees of valgus deformity, a marked decrease in the lateral joint space with cortical irregularity of the articular surface, calcification of the medial joint

space, and possible capsular calcification or osteochondral loose body.[10] (R. 490). Dr. Elmes also found that Plaintiff's range of motion in his left knee was one-hundred and thirty degrees (out of a possible one hundred and fifty degrees) on flexion. (R. 491, 499). In his right knee, Plaintiff's range of motion was a negative twenty degrees from full extension and eighty-five degrees (out of a possible one hundred and fifty degrees) on flexion. (*Id.*). Dr. Elmes observed that Plaintiff had a normal heel-to-toe gait pattern, but that he favored his right leg. (R. 491). He diagnosed Plaintiff with *inter alia* septic arthritis in his right knee, non-specific right knee pain, arthrofibrosis of his right knee, non-specific right thigh and calf pain, patellofemoral crepitus (probable choncromalacia) of his left knee, and exogenous obesity.[11] (R. 492).

Dr. Elmes assessed Plaintiff's ability to perform work-related activities and opined that he could lift and/or carry up to fifty pounds occasionally and forty pounds frequently and could walk and/or stand for less than two hours in a workday. (R. 492, 495). He indicated that Plaintiff could sit, but he must periodically alternate between sitting and standing in order to relieve his pain and discomfort. (R. 493, 496). Dr. Elmes noted that Plaintiff had limited pushing and pulling abilities in both his upper and lower extremities and could never climb scaffolds, ladders or ropes, kneel, crouch, or crawl, but he could occasionally climb ramps and stairs as well as occasionally balance and stoop. (*Id.*). He further opined that Plaintiff was subject to certain environmental limitations which included temperature extremes, vibration, humidity/wetness, and hazards (i.e., machinery and heights). (R. 493, 498).

---

[10]The lateral views of Plaintiff's X-ray evaluations showed "[c]alcifications, superior and inferior pole of the patella, with proximal displacement of the patella about ½ inch [and] a cortical irregularity to the mid one third of the medial femoral condyle." (R. 490).

[11]Dr. Elmes noted that Plaintiff weighed three hundred and twenty-two pounds. (R. 491).

On April 5, 2004, Dr. Brackett responded to written interrogatories posed by ALJ Cropper regarding Plaintiff's need to elevate his right leg while he is seated from January of 1996 to the present. (R. 541-42). Dr. Brackett reported that Plaintiff needed to elevate his right leg one to two feet off the floor in order to decrease the generalized edema (swelling) in his lower leg which was related to the initial knee injury, surgery and resultant infections. (R. 541). He opined that Plaintiff needed to elevate his right leg for ten minutes, three times in an eight-hour workday and, at night time, he should elevate his leg up on two to three pillows or elevate the foot of his bed.[12] (*Id.*). Dr. Brackett indicated that "[a] significant period of elevation could have been done during [Plaintiff's] breaks or lunch" and he did not "see a pressing need to have [him] elevate his leg at will." (*Id.*).

Dr. Brackett reported that, in addition to Plaintiff's knee impairment, his chronic and morbid exogenous obesity required that he elevate his right leg. (R. 542). He opined that Plaintiff's "obesity did affect his need to elevate his leg in such a way as all morbidly obese people have at least a significant increase in lymphatic in venous pressure." (*Id.*). Dr. Brackett indicated that Plaintiff's obesity "has a detrimental affect on his health, the need to elevate his legs, his cardiac condition, his increased venous stasis [i.e., circulatory system], etc." (*Id.*). He noted that he had not examined Plaintiff since November 18, 1999; therefore, he could not opine as to whether his medical need to elevate his right leg had changed at any time since that time period. (*Id.*). Dr. Brackett reviewed Dr. Elmes' orthopaedic consultative examination report performed on November 4, 2003 and concurred with his main opinions. (*Id.*).

Dr. Peter Biale, M.D., performed an internal medicine consultative examination of Plaintiff

---

[12]Dr. Brackett further opined that "the episodes of elevation should be done at home at which time [Plaintiff] could actually elevate the leg above the level of the heart." (R. 541).

on April 15, 2004. (R. 543-50). Upon examination, Dr. Biale found that Plaintiff limped due to problems with both knees and his range of motion on his right knee was limited at one-hundred and twenty degrees on flexion and lacked twenty degrees from full extension. (R. 545). He noted that Plaintiff's left knee was painful, but that his flexion and extension were within normal limits. (*Id.*). Dr. Biale indicated that Plaintiff was not able to squat or do the heel walk and he was obese. (R. 545-46).

Dr. Biale assessed Plaintiff's ability to do work-related activities and opined that he could lift and/or carry up to twenty-five pounds occasionally and ten pounds frequently. (R. 547). He indicated Plaintiff could stand and/or walk for less than two hours in an eight-hour workday and could sit for about six hours in an eight-hour workday. (R. 547-48). Dr. Biale noted that Plaintiff had limited pushing and/or pulling abilities in his lower extremities. (R. 548). He further reported that Plaintiff could never climb, balance, kneel, crouch, crawl or stoop and had the additional environmental limitation that he could not work around hazards which included machinery and heights.[13] (R. 548, 550).

## II.     PLAINTIFF'S TESTIMONY

Plaintiff, who was thirty-five years old at the time of the administrative hearing, was born on November 15, 1968.  (R. 468).  He testified that he had a high school education; however, he did not pursue additional education or training because he lacked the resources to do so. (R. 470, 627-28). Plaintiff stated that he lived with his mother in a first floor apartment (of a two flat building) so that he did not have to walk up and down the stairs. (R. 466, 621-22, 657). He indicated that he

---

[13]Dr. Biale also noted that Plaintiff weighed three hundred and twenty-five pounds. (R. 546).

had one child, a boy, who was four weeks old at the time. (R. 622-23). Plaintiff stated that he had previously worked in a warehouse, delivered furniture, and sold life and fire insurance. (R. 467, 630-31). He testified that he received short-term disability insurance for about two years, but that since 1995 or early 1996 he had no source of income. (R. 623-24).

Plaintiff stated that he injured both of his knees on October 3, 1993 while playing semi-professional football. (R. 605, 638). He had surgery on his knees and was bedridden for eight months after the surgery. (R. 611, 653). Plaintiff testified that he still has pain in his knees as a result of his injuries and often elevates his right leg to relieve the pain and swelling in his knee and calf. (R. 638, 640-41, 643). He indicated that Dr. Brackett told him that he was not going to get any better and his injury would not improve any further without a total knee replacement, but that surgery could not be performed until he was much older.[14] (R. 638-39). Plaintiff further testified that while he knew there had been newer developments with respect to treating knee conditions, he did not know why he had not found out if any of them would be helpful to him. (R. 660).

Plaintiff indicated that he had frequent episodes of right knee and calf swelling that varied throughout the day and that the swelling did not occur at a certain time of the day. (R. 464, 641-42). He indicated that standing and sitting increased the swelling. (R. 642). Plaintiff testified that he elevated his leg for ten to fifteen minutes at a time, three to five (or more) times a day and there had

---

[14]Plaintiff testified that he was also examined by a general practitioner who told him that his range of motion would not get any better and his right knee was "always going to be arthritic." (R. 641). He indicated that he was told that a total knee replacement was his only option and Dr. Brackett stated that elevating his right knee would take care of the swelling and over-the-counter medication would take care of the pain. (R. 659-60). Plaintiff also testified that he would not seek additional follow-up treatment from Dr. Brackett because he could not afford the treatment. (R. 660).

been no change in his swelling since 1996.[15] (R. 642-43). He indicated that he took over-the-counter medication (i.e., Advil or Tylenol) twice a day to relieve his pain when it became unbearable and when the swelling would not subside. (R. 643-44). Plaintiff testified that he experienced unbearable pain every day and that it took thirty to forty-five minutes for the medicine to make his pain bearable. (R. 644). He indicated that "[t]he pain is consistent. It's just a grinding feeling inside there." (*Id.*). Plaintiff further stated that he did not believe he could elevate his right leg on a scheduled basis because the pain and swelling did not occur at a certain time of the day or because of a certain event.[16] (R. 663). He indicated, however, that he had never discussed elevating his right leg on a scheduled basis rather than on an as needed basis with Dr. Brackett. (*Id.*). Plaintiff testified that he elevated his leg using three pillows while sleeping at night (R. 664) and that his right knee had actually deteriorated since five or six years ago. (R. 659).

Plaintiff testified that he was six foot two inches tall and weighed three hundred and sixty-four pounds. (R. 651). He stated that he could stand in place for about ten to fifteen minutes and then his left foot goes to sleep because all of his weight is on it and his right calf starts to swell. (R. 655). Plaintiff indicated that walking was less comfortable than standing because "it's more jarring." (*Id.*). He testified that he could walk for about ten minutes (i.e., approximately three blocks) and could sit for about thirty to forty-five minutes as long as he had the ability to adjust his position due to his right calf swelling and his knee becoming stiff. (R. 655-56). Plaintiff further indicated that he

---

[15]At the February 12, 1996 administrative hearing, Plaintiff testified that he needed to elevate his right leg at least three times a day and that he needed to elevate his leg overnight. (R. 454).

[16]At the previous administrative hearings, Plaintiff indicated that he could not elevate his right leg on a schedule, in a work environment, because the time of day he must elevate his leg varies according to the severity of the swelling. (R. 454-55).

thought he could lift fifty pounds while sitting down, but that he typically lifted twenty to thirty pounds comfortably and regularly carried bags of groceries. (R. 650, 654, 659).

With regard to Plaintiff's daily activities, he stated that he typically got up at 6:30 a.m. each morning and made sure that his sister got to school by about 7:30 a.m. or 8:00 a.m. (R. 644-45). After that, at around 9:00 a.m., throughout the period after the recent birth of his son, he would go to the hospital and stay there for about four hours.[17] (R. 645). Plaintiff would then return home, check on his mother, help his sister with her homework, and go back to the hospital at about 6 p.m., where he would stay for about another four hours.[18] (*Id.*). He indicated that his mother suffered from diabetes and multiple sclerosis, and that he helped her with chores around the house.[19] (R. 645-46). Plaintiff testified that he carried things, opened jars, washed dishes, cleaned the bathroom, swept the floor, and helped with his sister and with groceries. (R. 645-47). He further stated that he liked watching football games and elevated his right leg while watching television. (R. 649-50, 663-64).

## III.   VOCATIONAL EXPERT'S TESTIMONY

A VE testified at the administrative hearing held on September 14, 2004. (R. 667-80).  The ALJ posed a hypothetical question to the VE and asked her whether there were any jobs available for a hypothetical individual who was thirty-five years old, had a high school education, could

---

[17]Plaintiff testified that he typically saw his girlfriend for three to four hours each day at her apartment before their son was born. (R. 648).

[18]Plaintiff testified that he elevated his right leg in a recliner while he held and fed his son at the hospital. (R. 664-65).

[19]Plaintiff stated that his mother had a foster care license and had cared for a total of five foster children at one time. (R. 466, 625-27). During that time, Plaintiff stated that he helped with the children by driving them to school, taking them to physician's appointments, and assisting them with homework. (R. 647).  He also indicated that he ran errands for his mother. (R. 648).

perform the full range of sedentary work except that he could (1) only lift up to thirty pounds and carry up to ten pounds; (2) never do constant repetitive pushing or pulling against resistance with foot controls with either leg; (3) never climb ladders, ropes or scaffolds, work on moving or unstable surfaces, kneel, crouch or crawl; (4) occasionally climb ramps, stairs or stoop; and (5) never perform work that would expose him to temperature extremes, vibration, unprotected heights or unguarded hazardous equipment. (R. 669-70). In response, the VE identified jobs that such an individual could perform which included assembly jobs (4,000), office clerk jobs (6,000), and telephone operator jobs (3,000). (R. 670).

The ALJ next asked the VE to vary the hypothetical question by adding a limitation that such an individual would need to stand in place for sixty seconds after a continuous period of being seated for forty-five to sixty minutes. (R. 670). The VE indicated that this additional limitation would have no effect on the number of available office clerk and telephone operator positions, but it would reduce the assembly jobs by ten percent. (*Id.*). The ALJ then asked the VE about the available breaks for the jobs she identified and the VE stated that, with respect to the assembly jobs, there would typically be a morning lunch break and afternoon break, and with regard to the office clerk and telephone operator jobs, there would typically be a morning break and lunch break. (R. 671). The VE further indicated that the office clerk and telephone operator jobs were more flexible with respect to an individual being able to take time away from his workstation and that the assembly jobs would be the least flexible due to the pace and consistency required of the jobs.[20] (*Id.*).

The VE next testified that the jobs she identified would allow an individual to elevate his

[20]The VE testified that the office clerk job was the most flexible with regard to an individual taking time away from his workstation. (R. 671).

right leg to waist height for ten minutes during breaks and lunchtime. (R. 671-72). The VE indicated that the breaks for the assembly and telephone operator jobs were typically ten to fifteen minutes in length and that the office clerk job might be more flexible with breaks up to twenty minutes in length. (R. 672). The VE stated that lunch breaks were generally thirty to forty-five minutes in length. (*Id.*). The VE further testified that employers in the occupations she cited would not be expected to tolerate a worker who needed three unscheduled breaks in a workday without an accommodation by the employer and these employers would expect an employee to be on task and productive outside of break time about ninety percent of the time. (R. 672-74). Thus, the VE indicated that, with respect to the assembly and telephone operator positions, an employee would be required to be on task and productive about ninety to one-hundred percent of the time; however, the office clerk position would require an employee to be on task and productive about ninety percent of the time. (R. 674).

Plaintiff's attorney next asked the VE if the three types of jobs she identified as being available would be reduced if the hypothetical individual must elevate his right leg fifteen to thirty minutes, three times in an eight-hour workday in order to control his pain and swelling. (R. 675). Although parts of the VE's responses were inaudible, the VE appears to have testified that if such an individual had to elevate his right leg for up to thirty minutes, three times in an eight-hour workday, there were no jobs this individual could perform without an accommodation. (R. 675-76). The VE provided the following testimony:

ATTY:     . . . If a hypothetical individual must elevate the right leg 15 to 30
          minutes three times per day in order to -- . . .
ALJ:      To control pain and swelling.
                    * * * * *

17

ATTY: That would have to be done within an eight-hour workday. Would that further -- would that reduce at all the three types of categories of jobs that you talked about?

VE: Well, the manufacturing to have to -- during an eight-hour work period having to possibly elevate a leg up to a half an hour three times a day would -- couldn't [INAUDIBLE] any type of substantial gainful activity especially manufacturing being that you are working at table level. The telephone operating, if they have to leave their workstation to do that, to elevate their leg, again in working maybe with a pen and piece of paper, then being away from the essential job tasks at hand that could reduce them. That would be -- you know, it's hard to say [INAUDIBLE] it would be definitely an accommodation. (R. 675-76).

The VE also indicated that if such an individual needed to elevate his right leg at will when it swells, for ten minutes or so, in an eight-hour workday, all jobs would be eliminated. (R. 680).

In response to additional questioning by Plaintiff's attorney, the VE testified that if the hypothetical individual, during his periods of sitting, needed to periodically alternate between sitting and standing in order to relieve pain and discomfort, the assembly and office clerk jobs would be reduced by fifty percent and the telephone operator jobs would either be reduced or eliminated. (R. 677). The VE further stated that if such an individual was only able to stand and/or walk for less than two hours in an eight-hour workday, all three types of jobs would be reduced by twenty-five percent. (R. 677-78).

## IV. DISTRICT COURT REMAND

On August 30, 2002, Magistrate Judge Denlow issued an opinion and order remanding this case to address shortcomings in the ALJ's analysis at step five of the sequential evaluation and to reassess Plaintiff's credibility. *Lawson v. Barnhart,* 218 F.Supp.2d 967, 972-73 (N.D. Ill. Aug. 30, 2002). In his opinion, Magistrate Judge Denlow stated that "[c]laimant's case hinges on whether he

must repeatedly and unpredictably elevate his right leg" and noted that the ALJ "never examined the simpler, yet still dispositive, issue as to whether Claimant's need to elevate his leg was sporadic." *Id.* at 972. He ordered the ALJ on remand to "look at whether Lawson's pain and swelling necessitate a periodic and *sporadic* elevation of his right leg or a periodic and *scheduled* elevation of his right leg." *Id.* at 973. (Emphasis in Original). Specifically, Magistrate Judge Denlow directed that:

> [T]he ALJ should consult Dr. Brackett for elaboration of his 1996 and 1999 reports to determine whether Lawson's pain and swelling requires a sporadic elevation of the right leg or whether it can be accommodated with a scheduled elevation of the leg at regular work breaks. He should also consult any other testimony or evidence which would elaborate this issue. Should the evidence reflect a limitation other than those presented to the VE (scheduled and unscheduled elevation breaks), the ALJ will need to further consult with a VE concerning Lawson's ability to perform work in the national economy. *Id.*

Magistrate Judge Denlow further ordered the ALJ to reassess Plaintiff's credibility with respect to his claims of pain and swelling in light of the objective medical evidence in the case supporting these claims. *Id*.

## V.    ALJ CROPPER'S DECISION

The ALJ found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset date of his disability. (R. 470).

The ALJ determined that Plaintiff had a high school education and is an individual who fell within the younger individual age category because he was thirty-five years old at the time of the administrative hearing. (R. 468, 470).

The ALJ found that Plaintiff's medical condition had improved as of January 20, 1996, when

he regained the ability to perform a wide range of sedentary work. (R. 470). The ALJ indicated that Plaintiff was unable to perform any of his past relevant work and had no transferable skills from any past relevant work. (*Id.*).

The ALJ determined that the medical evidence established that Plaintiff had a history of bilateral knee injuries, degenerative changes with residual right knee limitations, and obesity which constituted severe impairments. (R. 470). The ALJ, however, found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulation No. 4. (*Id.*).

Because the ALJ found that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC") and determined that he could perform and sustain most sedentary work. (R. 470). Specifically, the ALJ found that Plaintiff could lift and carry up to twenty-five pounds occasionally and up to ten pounds frequently, could stand and/or walk for up to two hours in an eight-hour workday, and could sit throughout a normal eight-hour workday, with the option to stand in place for one minute after being seated for a continuous period of forty-five to sixty minutes. (R. 467). The ALJ concluded that Plaintiff could not do pushing or pulling against resistance with his lower extremities, could never climb ladders, ropes, or scaffolds, could not work on moving or unstable surfaces, kneel, crouch or crawl, but he could occasionally climb ramps or stairs, and stoop. (*Id.*). She determined that Plaintiff should not be exposed to temperature extremes, vibration, unprotected heights or unguarded hazardous equipment. (*Id.*). The ALJ further concluded that Plaintiff needed to elevate his right leg for up to three times in an eight-hour workday and for up to fifteen minutes each time, and that his need to elevate his right leg could be accommodated at scheduled work breaks and lunch times. (R. 467,

470).

The ALJ determined, using the Medical-Vocational Guidelines, Rule 201.28, as supplemented by the VE's testimony, that notwithstanding Plaintiff's exertional limitations, he could perform a significant number of jobs that existed in the national economy. (R. 470-71). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. These jobs included assembly jobs (3,600), office clerk jobs (6,000), and telephone operator jobs (3,000). (R. 469).

The ALJ further concluded that Plaintiff's allegations regarding his limitations after January of 2000 are neither fully consistent with nor well-supported by the objective medical evidence and other evidence in the record. (R. 470).

Accordingly, the ALJ determined that Plaintiff was not disabled as defined by the Act. (R. 471).

## LEGAL STANDARDS

### I. STANDARD OF REVIEW

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995)(quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003)(quoting *Clifford v. Apfel*, 227

F.3d 863, 869 (7ᵗʰ Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to her conclusion," she need not discuss every piece of evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7ᵗʰ Cir. 2001). The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala,* 999 F.2d 180, 181 (7ᵗʰ Cir. 1993)(per curiam)(quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7ᵗʰ Cir. 1985)).

## II.    ANALYSIS UNDER THE SOCIAL SECURITY ACT

A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling ("a listing-level impairment"), (4) if the clamant does not have a conclusively disabling impairment, whether [he] can perform [his] past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176; 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter,* 245 F.3d 881, 885-86 (7ᵗʰ Cir. 2001). If the claimant reaches step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."

22

*Id.* at 886.

<h2 style="text-align:center"><u>ANALYSIS</u></h2>

Plaintiff seeks reversal of the ALJ's decision that he is not disabled and an award of DIB and SSI benefits, or alternatively, he requests that the case be remanded to the SSA based on numerous legal errors made by the ALJ.

## I. LEG ELEVATION ISSUE

Plaintiff avers that the ALJ improperly credited and relied on Dr. Brackett's 2004 opinion (i.e., answers to the ALJ's interrogatories) that he needed to elevate his right leg for ten minute intervals, three times during an eight-hour workday on scheduled work breaks. (Pl.'s Mem. at 11). Plaintiff points out that Dr. Brackett previously indicated in 1996 and 1999 that he needed to elevate his right leg for fifteen to thirty minutes intervals, three times during an eight-hour workday in order to control pain and swelling; however, in 2004, without explanation and without relying on objective medical evidence, Dr. Brackett changed his assessment and opined that Plaintiff only needed to elevate his right leg for ten minute intervals, three times during an eight-hour workday. (*Id.* at 11-12). Accordingly, Plaintiff contends that the ALJ erred in relying on Dr. Brackett's opinion that he needed to elevate his right leg for ten minute intervals in light of the fact that Dr. Brackett had no opinion as to whether Plaintiff's condition had changed since 1999; therefore, he unreasonably and illogically changed this portion of his opinion. (*Id.*).

The Commissioner, on the other hand, asserts that the main question in this case, which revolved around a restriction set out by Dr. Brackett concerning whether Plaintiff must repeatedly and unpredictably elevate his right leg, has been resolved. (Def.'s Mem. at 10). Specifically, the

Commissioner points out that Magistrate Judge Denlow remanded the case to the ALJ for a determination as to whether Plaintiff's right leg pain and swelling required him to elevate his leg sporadically or whether he could elevate his leg on regular, scheduled work breaks. (*Id.*). The Commissioner further states that in response to the ALJ's interrogatories, Dr. Brackett opined that Plaintiff did not need to elevate his right leg at will; therefore, Plaintiff's right leg elevation could be accommodated during scheduled work breaks. (*Id.*). Accordingly, the Commissioner avers that Dr. Brackett's 2004 opinion settles the main question in this case and constitutes substantial evidence supporting the ALJ's finding that Plaintiff is not disabled. (*Id.*).

In her decision, the ALJ found that Plaintiff needed to elevate his right leg for up to three times in an eight-hour workday (shift) and for up to fifteen minutes intervals and that his need to elevate his right leg could be accommodated during scheduled breaks and lunch periods. (R. 467). She further stated that Dr. Brackett, in his 2004 interrogatory answers, "specifically addressed whether the elevation, regardless of the duration, needed to be done sporadically or could be done on a schedule, and his opinion is completely uncontradicted in the record." (R. 458). The ALJ also indicated that "[d]espite his lack of recent treatment . . . , I believe that Dr. Brackett's opinion on the very specific issue of whether [Plaintiff] could have elevated his right leg on schedule, instead of as needed, is the most reliable evidence in the record on that issue." (R. 458). She further noted that "[n]one of the other medical experts, including [the] examining and reviewing doctors, offered any opinion as to whether the elevation could be done on scheduled breaks, or had to be available unpredictably throughout the workday." (R. 458). Accordingly, the ALJ credited Dr. Brackett's 2004 opinion that Plaintiff's right leg elevation could be accommodated during scheduled breaks and lunch periods. (R. 467).

The Court finds, however, that the ALJ neither credited Dr. Brackett's 1996 and 1999 opinions nor his 2004 opinion regarding the length of time Plaintiff needs to elevate his right leg in order to reduce his pain and swelling.[21] (R. 326, 328, 427, 467, 541). Rather, it appears, that the ALJ decided, on her own, without relying on any medical evidence in the record, that Plaintiff needed to elevate his right leg for up to fifteen minute intervals. (R. 467). It bears repeating that Dr. Brackett opined in 1996 and 1999 that Plaintiff needed to elevate his right leg for fifteen to thirty minute intervals and, in 2004, he indicated that Plaintiff needed to elevate his right leg for ten minute intervals. (R. 326, 328, 427, 541). The ALJ, however, did not credit Dr. Brackett's opinions and instead determined that Plaintiff needed to elevate his right leg for up to fifteen minutes intervals. (R. 458, 467). *See e.g., Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990)("[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.").

The Court finds that a remand on the issue of the length of time Plaintiff needs to elevate his right leg is required because Dr. Brackett's 1996 and 1999, and 2004 medical opinions are inconsistent and contain a conflict or ambiguity with respect to how much time Plaintiff needs to elevate his leg in order to reduce his pain and swelling. *See e.g., Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995)("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence."). The length of time issue is critical because whether there is work in the national economy that Plaintiff can perform directly hinges on the length of time he needs to elevate

---

[21]Plaintiff's contention that the ALJ erred in relying on Dr. Brackett's opinion that Plaintiff only needed to elevate his right leg for ten minute intervals, three times a day is unavailing because the ALJ found that Plaintiff needed to elevate his leg for up to fifteen minute intervals and not ten minute intervals. (Pl.'s Reply at 2, R. 467).

his right leg. Thus, the VE appeared to testify that if Plaintiff needed to elevate his right leg for up to thirty minute intervals, three times in an eight-hour workday, that there were no jobs he could perform without an accommodation. (R. 675-76).

Importantly, and as Plaintiff points out, Dr. Brackett, in his response to the ALJ's 2004 interrogatories, stated that he had no opinion as to whether Plaintiff's condition had changed since November of 1999. (R. 542). Thus, when asked whether "claimant's medical need to elevate his leg has changed at any time after January, 1996 and continuing to present", Dr. Brackett stated that "I am not aware of the patient's condition since 11-18-99 and therefore have no opinion." (*Id.*). Subsequently, in 2004, after not examining Plaintiff since 1999, Dr. Brackett changed his opinion about the length of time Plaintiff needed to elevate his right leg by opining that he needed to elevate his leg for only ten minute intervals as opposed to the fifteen to thirty minute intervals he previously indicated Plaintiff needed in 1996 and 1999.[22] (R. 326, 328, 427, 541-42).

The Court therefore remands the case in order for the ALJ to recontact Dr. Brackett to clarify the inconsistencies in his 1996 and 1999, and 2004 medical opinions regarding the length of time Plaintiff needs to elevate his right leg to control his pain and swelling. Specifically, 20 C.F.R. §§ 404.1512(e)(1); 416.912(e)(1) provide, in pertinent part:

> We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when *the report from your medical source contains a conflict or ambiguity that must be resolved*, the report does not contain all necessary information, or does not appear to

---

[22]It bears noting that Dr. Brackett provided no basis for changing his position on the length of time Plaintiff needed to elevate his right leg. (R. 541-42).

be based on medically acceptable clinical and laboratory diagnostic techniques.[23] (Emphasis added).

*Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994); *see also West v. Apfel,* No. 99 C 6235, 2000 WL 1847766, at *6 (N.D. Ill. Dec. 14, 2000)(district court *inter alia* remanded case to recontact the treating psychologist in order to clarify inconsistencies in her report with respect to the plaintiff's Global Assessment of Functioning); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)(citations omitted)(an ALJ must build an "accurate and logical bridge from the evidence to [her] conclusion."). The ALJ is further directed to propound new hypothetical questions to the VE based on Dr. Brackett's clarification of the length of time Plaintiff needs to elevate his right leg.

The Court also finds that the ALJ erred when she relied solely on Dr. Brackett's 2004 opinion that Plaintiff could elevate his right leg on a schedule rather than sporadically. The ALJ found that Dr. Brackett's 2004 opinion was "uncontradicted" and the most reliable evidence in the record on this issue. However, the ALJ failed to question any other physician about whether Plaintiff needed to elevate his leg on a schedule or sporadically. (Pl.'s Reply at 12-13, R. 458). Moreover, the ALJ relied on Dr. Brackett's 2004 opinion despite the fact that Dr. Brackett had not treated or examined Plaintiff since November1999. (R. 542). Accordingly, on remand, the ALJ is directed to develop a full and fair record by obtaining additional relevant medical evidence which would elaborate on the issue of whether Plaintiff can elevate his right leg on a schedule or whether he needs to elevate it sporadically throughout the workday. *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000)("the ALJ

---

[23]Moreover, if the relevant information cannot be obtained from Dr. Brackett, the ALJ shall follow the mandate established in 20 C.F.R. §§ 404.1512(f); 416.912(f) which states if ". . . we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense."

has a duty to develop a full and fair record."); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991)(quoting *Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)("[i]t is a basic obligation of the ALJ to develop a full and fair record.").[24]

## II.    RESIDUAL FUNCTIONAL CAPACITY ISSUE

Plaintiff contends that the ALJ failed to properly assess his RFC. (Pl.'s Mem. at 16-18). Initially, Plaintiff avers that the ALJ erred in failing to recognize that not all of the jobs identified by the VE allowed for three breaks during an eight-hour workday even though the ALJ make an RFC finding that Plaintiff needed to elevate his right leg for up to three times in an eight-hour shift. (*Id.* at 17, R. 467).  Specifically, Plaintiff asserts that while the VE identified three jobs that Plaintiff was capable of performing, the office clerk job was the only job that had three scheduled breaks; thus, the ALJ erred in failing to recognize that not all of the jobs allowed for three scheduled breaks during the workday. (*Id.* at 17).  He further points out that while he testified that he needed to elevate his right leg up to three times, he also testified that, at times, he needed to elevate his leg five or more times. (*Id.*, R. 642).  Plaintiff, therefore, contends that with only one job that could accommodate his need to elevate his right leg three times in an eight-hour workday, the occupational base was significantly eroded which precluded him from substantial gainful activity. (*Id.* at 17).

The Commissioner, on the other hand, presents no argument disputing Plaintiff's contention

---

[24]The Commissioner asserts that Drs. Elmes and Biale chose not to set a limitation on Plaintiff's need to elevate his right leg because "[t]he absence of such a limitation strongly suggests that neither Dr. Elmes nor Dr. Biale felt that such a limitation was needed." (Def.'s Mem. at 13).  The Court finds that the Commissioner is attempting to offer a post-hoc rationalization which cannot be considered. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)("But regardless of whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and [we] confine our review to the reasons supplied by the ALJ.").

that the jobs identified by the VE did not contain the requisite three breaks. (*See* Def.'s Mem).

The Court finds that the record is unclear as to the number of available breaks for each of the three jobs (i.e., assembly (manufacturing), telephone operator (service), and office clerk (clerical)) identified by the VE as being those that Plaintiff was capable of performing. (R. 670-71). The VE provided the following testimony on this issue:

> Q.: In the types of jobs you cited, what types of break[s] and lunches are typical?
>
> A.: In the three types of unskilled employment that I cited, being manufacturing, [INAUDIBLE] service and [INAUDIBLE] clerical industries. In the assembly, it's more typical that you would get a morning lunch break, afternoon type of a break. The office clerking would be more of a morning break and lunch break. The service, again, morning break and lunch break.
>
> Q.: And so in the office clerk and telephone jobs there would be no afternoon break?
>
> A.: It's not typical because of the – it's more typical that they take the break as like – you know, while you're on the job because the demands of the work aren't that – as consistent as required in the manufacturing type of a setting. So if you walk away from your desk for five minute[s] and maybe get a cup of coffee, necessarily there is not going to be a rigid break system as there would be in a manufacturing type of setting.
>
> Q.: So the office and telephone jobs are more flexible with respect to time away from the workstation?
>
> A.: The office clerk being the most.
>
> Q.: And the service is kind of in the middle and the manufacturing is the least?
>
> A.: Yes, due to the pace and consistency required. (R. 671).

Based on the VE's testimony, it appears that the telephone operator and office clerk jobs have both a morning break and lunch break, but no formal afternoon break. (R. 671). So while the VE states there is flexibility with respect to the telephone operator and office clerk jobs regarding time away from the workstation, there is no specific formal break period in the afternoon for these jobs. (*Id.*). Moreover, with respect to the assembly jobs, it is unclear from the VE's testimony whether there are

two or three breaks for these types of jobs because the VE testified that there is "a morning lunch break, afternoon type of a break."[25] (*Id.*). Accordingly, the ALJ erred in finding that Plaintiff was capable of performing the assembly, telephone operator, and office clerk jobs when the VE's testimony was unclear as to whether those jobs provide the requisite breaks Plaintiff needs in order to lift his right leg three or more times during an eight-hour workday to reduce his pain and swelling. (R. 326, 328, 427, 467, 541, 642-43).

Next, Plaintiff points out that the ALJ erred by finding that he could sit through a normal workday "with the option to stand in place for one minute after a continuous period seated of 45 to 60 minutes" even though no physician stated these specific limitations. (Pl.'s Mem. at 17, R. 467). The Commissioner, however, avers that because Dr. Elmes recommended that Plaintiff should periodically alternate between sitting and standing to relieve his pain and discomfort that the ALJ provided him with the option to stand in one place for one minute after being continuous seated for periods of forty-five to sixty minutes. (Def.'s Mem. at 12).

The Court finds that there is no medical evidence in the record to support the ALJ's RFC finding that Plaintiff should stand in place for one minute after being continuously seated for forty-five to sixty minutes. Rather, as the ALJ noted, Dr. Brackett indicated that Plaintiff needed to sit and stand periodically. (R. 464). Moreover, the record reflects that Dr. Elmes opined that Plaintiff could sit, but he must periodically alternate between sitting and standing. (R. 493, 496). The ALJ's error is significant because the VE testified that if an individual has to alternate between sitting and standing, the assembly and office clerk jobs would be reduced by fifty percent, and the telephone

---

[25]The ALJ appears to have interpreted the VE's statement to mean that there were three breaks for the assembly jobs. (R. 671).

operator jobs would be either reduced or eliminated. (R. 677). Accordingly, the ALJ erred with respect to this finding because it is not supported by any medical evidence in the record and she made her own independent medical judgment. *See e.g., Rohan*, 98 F.3d at 970.

Plaintiff further contends that the ALJ erred in his RFC determination when she found that he could stand and/or walk for up to two hours in an eight-hour workday when Drs. Elmes and Biale opined that he could stand and/or walk for less than two hours in an eight-hour workday. (Pl.'s Mem. at 17, R. 467, 495, 547). Plaintiff points out that the ALJ gave great weight to Drs. Elmes and Biale's opinions, Dr. Brackett concurred with Dr. Elmes' assessment, and Dr. Biale found that he could sit for up to six hours in an eight-hour workday. (*Id.* at 17). Accordingly, Plaintiff avers that given these medical assessments, he is limited to working less than eight hours a day which would preclude him from working and warrants a finding of disability. (*Id.*).

The Commissioner, on the other hand, asserts that Dr. Feinberg's RFC assessment was consistent with Plaintiff's ability to perform sedentary work. (Def.'s Mem. at 15). The Commissioner points out that the ALJ substantially relied on Dr. Elmes' report that Plaintiff had a normal gait and could lift up to forty pounds on a frequent basis. (*Id.*). Therefore, according to the Commissioner, the ALJ's RFC determination is strongly supported in the record. (*Id.*).

The Court finds that the record is unclear as to whether Plaintiff can indeed perform sedentary work. SSR 96-9p provides in relevant part:

> Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday.

Plaintiff correctly points out that Drs. Elmes and Biale opined that he could stand and/or walk for less than two hours and Dr. Biale also indicated that he could sit for up to six hours in a workday. (R. 495, 547-48). Dr. Elmes opined that Plaintiff could sit, but he never specified the exact number of hours that he could sit. (R. 493, 496). The ALJ gave great weight to Dr. Elmes' opinion and noted that Dr. Brackett concurred with Dr. Elmes' opinion.[26] (R. 463). Accordingly, the record needs further development with respect to whether Plaintiff can engage in work-related activities on a regular and continuing basis.[27] SSR 96-8p, 1996 WL 374184, at *1 (". . .RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."); *Coppage ex rel. Osborne v. Barnhart*, No. 03 C 3111, 2004 WL 830475, at *8 (N.D. Ill. Apr. 14, 2004)("Any physical limitation that prevents a claimant from working a full eight-hour workday, not including lunch or reasonable breaks, is a disability under the Act.").

Therefore, for the aforesaid reasons, the Court finds that the ALJ erred in her RFC finding and a remand on this issue is warranted.

---

[26]As previously discussed, Dr. Brackett indicated that he was unaware of Plaintiff's condition because he had not treated or examined him since November of 1999. (R. 542).

[27]On July 6, 1998, Dr. Feinberg noted that Plaintiff's impairment affected his standing and walking abilities, but he did not specify the number of hours Plaintiff could stand and/or walk. (R. 374). He also noted that Plaintiff's ability to sit was not affected. (*Id.*). On March 11, 1999, Dr. Smith opined that Plaintiff could stand and/or walk at least two hours in an eight-hour workday; however, he noted that Plaintiff could sit, but he must periodically alternate between sitting and standing. (R. 398).

## III.    OBESITY ISSUE

Plaintiff asserts that the ALJ failed to properly consider his obesity alone or in combination with his other impairments as required by Social Security Ruling ("SSR") 02-1p, an SSA policy outlining the role of obesity in determining whether an individual is disabled.[28] (Pl.'s Mem. at 13-16). Plaintiff points out that, at the time of the administrative hearing, he weighed three hundred and fifty-four pounds yielding a body mass index[29] of forty-eight, which placed him in the extreme obesity category delineated in SSR 02-1p.[30] (*Id*. at 13, R. 461). Thus, Plaintiff avers that while the ALJ found that his obesity did not cause an inability to ambulate effectively (R. 461), she should have also considered that, at three hundred and fifty-four pounds, Plaintiff's obesity in and of itself could have been disabling regardless of whether he had difficulty ambulating. (Pl.'s Mem. at 14). Plaintiff further contends that the ALJ erred by finding that he was not treated for any obesity-related chronic medical problems even though there was substantial medical evidence showing that he had obesity-related medical problems which included septic arthritis, knee pain, arthrofibrosis, thigh and calf pain, patellofemoral crepitus, and possible chrondomalacia. (*Id*. at 15). Plaintiff also avers that the ALJ failed to properly assess Plaintiff's obesity in light of Dr. Brackett's April 2004 opinion (i.e., answers to the ALJ's interrogatories) that his obesity affected his need to elevate his leg due to

---

[28]The ALJ went beyond the scope of Magistrate Judge Denlow's remand order when she considered the issue of Plaintiff's obesity.

[29]The degree of an individual's obesity is calculated according to a body mass index which is a formula that compares an individual's weight in kilograms to the individual's height in meters squared. (R. 461).

[30]Dr. Elmes reported in November of 2003 that Plaintiff weighed three hundred and twenty-two pounds and Dr. Biale reported in April 2004 that Plaintiff weighed three hundred and twenty-five pounds. (R. 461).

lymphatic venous pressure and had a detrimental effect on his health, his need to elevate his legs, his cardiac condition and his increased venous stasis (i.e., circulatory system) in his legs. (*Id.* at 15).

The Commissioner, on the other hand, avers that Plaintiff's obesity arguments are belied by his reliance on Dr. Brackett's April 2004 opinion because it is this very opinion that he urges this Court to reject. (Def.'s Mem. at 17-18). The Commissioner further points out that in Dr. Brackett's April 2004 opinion, Dr. Brackett indicates that Plaintiff's obesity has a detrimental effect on his health and, after reviewing Dr. Elmes' report, Dr. Brackett agrees with Dr. Elmes' main opinions. (*Id.* at 17). The Commissioner thus contends that the ALJ substantially relied on Dr. Elmes' opinion, who diagnosed Plaintiff with exogenous obesity and found, that despite his obesity and knee problems, he walked with a normal heel-to-toe gait pattern and could lift forty pounds on a frequent basis.[31] (*Id.* at 17-18). Accordingly, the Commissioner asserts that the ALJ fully considered Plaintiff's obesity and its affect on his ability to work and concluded that he was capable of performing sedentary work. (*Id.* at 18).

The SSA issued Policy Interpretation Ruling SSR 02-1p to clarify the role of obesity in ascertaining whether an individual is disabled. SSR 02-1p, 2000 WL 628049, at *3. The SSA declared that all adjudicators at all levels of administrative review should consider obesity in determining whether an individual has a medically determinable impairment and whether the impairment is severe. *Id.* While obesity is no longer considered a listing-level impairment, it may be considered a medically determinable impairment capable of affecting a claimant's disability determination, either by itself or in conjunction with other impairments. *Id.* at *1. Indeed, the policy

_____

[31]The Commissioner also contends that the ALJ relied on Dr. Brackett's April 2004 opinion. (Def.'s Mem. at 18).

ruling specifically states that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id.* Furthermore, pursuant to SSR 02-1p, the ALJ must also consider whether obesity contributes to finding a listing-level impairment at step three, whether it affects the RFC assessment at step four, and whether it prevents an individual from working in the national economy at step five. *Id.* at *3.

The Court finds that the ALJ properly assessed Plaintiff's obesity as a separate medically determinable impairment and in combination with his knee impairments. Initially, the Court notes that the medical evidence in the record supports the ALJ's decision that Plaintiff was not being treated for any obesity-related chronic medical problems. (R. 461). Rather, those medical problems Plaintiff avers relate to his obesity which include septic arthritis, knee pain, arthrofibrosis, thigh and calf pain, patellofemoral crepitus, and possible chrondomalacia are due to his knee impairments. (R. 492). While Plaintiff correctly points out that Dr. Brackett, in his April 2004, opinion stated that "his obesity did affect his need to elevate his leg in such a way as all morbidly obese people have at least a significant increase in lymphatic invenous pressure" and "his obesity has a detrimental affect on his health, the need to elevate his legs, his cardiac condition, his increased venous stasis [circulatory system], etc," the ALJ correctly determined that while Plaintiff's obesity "does affect [his] circulatory system", the record did not establish that Plaintiff's "circulatory problems ha[d] caused any peripheral arterial disease or chronic venous insufficiency." (R. 461). Moreover, the ALJ correctly points out that Plaintiff had "no documented period during the relevant time of ineffective ambulation, or other severe functional limitation attributable to his obesity or related problems." (*Id.*). Accordingly, in reaching her decision regarding Plaintiff's obesity impairment, the ALJ relied on the fact that he was not treated for any obesity-related chronic medical problems and that his

ability to ambulate was limited primarily by this right knee impairment. (*Id.*).

Plaintiff, however, contends that the ALJ improperly found that Plaintiff had a "normal or near normal gait" and could ambulate effectively. (Pl.'s Mem. at 14-15). Plaintiff bases his assertion on Dr. Biale's medical opinion that Plaintiff limped due to problems with both knees and was not able to squat or do the heel walk as well as the fact that the ALJ gave significant weight to Dr. Biale's opinion. (*Id.* at 15, R. 463, 545). The Court finds, however, that the ALJ reasonably relied on the consultative examiners' opinions who described Plaintiff's gait as "normal or near normal, and unassisted" in evaluating his obesity. (R. 460). In fact, it bears noting that Dr. Biale was the only consultative examiner who noted that Plaintiff limped due to problems with his knees, or in other words, had an abnormal gait. (R. 545).

Because the ALJ correctly assessed Plaintiff's obesity as both a separate medically determinable impairment and in combination with his knee impairments, a remand on this issue is not warranted.[32]

## IV.  CREDIBILITY DETERMINATION ISSUE

Plaintiff avers that the ALJ failed to properly analyze his credibility by drawing unsupported inferences about his testimony. (Pl.'s Mem. at 18-20). Plaintiff initially asserts that the ALJ did not "give full credit" to his testimony regarding his right knee impairments because she found that Plaintiff "offered materially inconsistent testimony" by first stating that his knee condition had not

---

[32]The ALJ assessed whether Plaintiff's obesity contributed to a listing-level impairment at step three (i.e., Listing 1.02A), how it affected Plaintiff's RFC assessment at step four, and whether it prevented him from working in the national economy at step five. SSR 02-1p, 2000 WL 628049, at *3.

changed since 1996 and later stating that his knee had deteriorated progressively during that interval. (*Id*. at 18, R. 466). Next, Plaintiff contends that the ALJ erroneously discredited his testimony that he suffered from "unbearable pain" because she relied on the assumption that he should have sought additional medical treatment for his pain. (*Id.* at 18-19, R. 466). Lastly, Plaintiff asserts that the ALJ erred in her credibility assessment because she determined that based on his daily activities he was able to "function quite normally" and "move about the area frequently", despite his obesity and knee problems. (*Id.* at 19-20, R. 467).

The Commissioner, on the other hand, avers that the ALJ correctly assessed Plaintiff's credibility and found inconsistencies in his testimony including Plaintiff's statement that he could not sit for more than forty-five minutes at a time even though he was able to sit through the two hour administrative hearing. (Def.'s Mem. at 15, R. 465). The Commissioner also contends that while Plaintiff asserts that the ALJ erred in discrediting his statement that he was simply following Dr. Brackett's advice by not seeking further medical treatment for his pain, the ALJ found that Plaintiff's actions were not consistent with his allegations of "unbearable pain" because it was unlikely that he would continue to take the same medication for five years without consulting a physician. (*Id.* at 15-16, R.464, 466). The Commissioner further contends that the ALJ correctly assessed Plaintiff's daily activities in determining that he could function normally without significant problems. (*Id*. at 16, R. 465-66, 467).

An ALJ's credibility determination is given deference because the ALJ is in the best position to observe and hear the witness. *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000). A reviewing court will not disturb an ALJ's credibility determination unless the determination is patently wrong. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001). However, an ALJ's decision must build a

"logical bridge between the evidence and the result." *Shramek,* 226 F.3d at 811. An ALJ's credibility determination must include specific reasons for the finding, be supported by the evidence in the record and be specific enough to show the weight the ALJ gave the claimant's statements and the reasons for that weight. *Zurawski,* 245 F.3d at 887.

The Court agrees with Plaintiff and finds that the ALJ erred in her credibility determination. First, the ALJ erred when she determined that Plaintiff "offered materially inconsistent testimony" because he was actually asked two different questions which elicited two different responses. (R. 466). Specifically, the ALJ initially asked Plaintiff whether his right knee swelling had changed since 1996 and he responded that it had not. (R. 641-43). Next, the ALJ asked Plaintiff about his ability to walk four to five blocks and he indicated that he had less tolerance for walking now and that his knee had actually deteriorated quite a bit. (R. 659). Accordingly, the Court finds that the ALJ erred when she categorized Plaintiff's testimony as being materially inconsistent because Plaintiff responded to separate and distinct questions posed by the ALJ.

With regard to Plaintiff's lack of medical treatment, the ALJ erred when she determined that Plaintiff was not credible because he declined to seek treatment from any medical provider for his deteriorating right knee condition and "unbearable pain" during the preceding five year period. (R. 466). Initially, it bears noting that, at the administrative hearing, Plaintiff testified that Dr. Brackett told him that he was not going to get any better and his injury would not improve any further without a total knee replacement, but that surgery could not be performed until he was much older.[33] (R. 638-

---

[33]Plaintiff also testified that he was examined by a general practitioner who told him that his range of motion would not get any better and his right knee was "always going to be arthritic." (R. 641).

39). He further stated that he was told that a total knee replacement was his only option and Dr. Brackett, Plaintiff's treating orthopedic surgeon, stated that elevating his right knee would take care of the swelling and over-the-counter medication would take care of the pain.[34] (R. 659-60). Accordingly, Plaintiff's testimony reflects that he followed the medical treatment plan prescribed by Dr. Brackett and because he did not believe his condition would improve, he reasonably did not seek out additional treatment options.[35] SSR96-7p, 1996 WL 374186, at *7 (" . . . the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. . . The explanations provided by the individual may provide insight into the individual's credibility.").

With regard to Plaintiff's daily activities, the ALJ noted that "claimant's description of his activities, including his efforts to assist his mother and sister at home, and his current involvement with his sister, girlfriend and child suggest that he is able to function quite normally, and to move about the area frequently, without significant problems, despite his knee problems and obesity." (R. 467). At the administrative hearing, however, Plaintiff testified that he made sure his sister got to school in the morning, spent approximately eight hours each day at the hospital after the birth of his son, helped his sister with homework, did chores around the house which included carrying things, opening jars, washing dishes, cleaning the bathroom, sweeping the floor, and helped with the

---

[34]There is also evidence in the record that Plaintiff took Ultram for his pain. (R. 415-16).

[35]Plaintiff testified that he would not seek additional follow-up treatment from Dr. Brackett because he could not afford the treatment. (R. 660).

groceries. (R. 644-47). With regard to the time he spent at the hospital, Plaintiff stated that he

elevated his right leg in a recliner while he held and fed his son. (R. 664-65). Plaintiff also indicated

that, at one point, his mother, who had a foster care license had cared for a total of five foster

children at one time. (R. 625-27). During that time period, Plaintiff testified that he helped with the

children by driving them to school, taking them to physician's appointments, and assisting them with

homework. (R. 647).

The Court finds, however, that Plaintiff's daily activities are fairly restricted and not the type

of activities that undermine or contradict his claim of disabling impairments. *See e.g., Zurawski*, 245

F.3d at 887 (finding that the plaintiff's activities "are fairly restricted (*e.g.*, washing dishes, helping

his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily

undermines or contradicts a claim of disabling pain"); *Clifford*, 227 F.3d at 872 (noting "minimal

daily activities . . . do not establish that a person is capable of engaging in substantial physical

activity"); *see also Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004)("[The ALJ] failed to

consider the difference between a person's being able to engage in sporadic physical activities and

her being able to work eight hours a day five consecutive days of the week.").[36] Herein, the ALJ's

analysis of Plaintiff's daily activities does not necessarily equate with his ability to perform the full

range of exertional and non-exertional work-related activities. *See e.g.*, *Brown v. Massanari*, No. 00

C 6839, 2001 WL 1315075, at *2 (N.D. Ill. Oct. 26, 2001); *O'Connor v. Sullivan*, 938 F.2d 70, 74

---

[36]In *Carradine,* the Seventh Circuit noted that the plaintiff did not "claim to be in
wracking pain every minute of the day." *Carradine,* 360 F.3d at 755.  Rather, "[w]hen she feels
better for a little while, she can drive, shop, do homework.  It does not follow that she can
maintain concentration and effort over the full course of the work week. The evidence is that she
cannot." *Id.* at 755-56.

(7th Cir. 1996). Thus, the ALJ should have explained the inconsistencies between Plaintiff's daily activities, his complaints of pain, and the medical evidence. *Zurawski*, 245 F.3d at 887.

Therefore, for the aforesaid reasons, the Court finds that the ALJ erred in her credibility determination and a remand on this issue is warranted.[37]

## **CONCLUSION**

Based on the foregoing, Plaintiff's motion for summary judgment is granted in part and denied in part, and the Commissioner's motion for summary judgment is denied. Accordingly, the case is remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

**ENTER:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: July 25, 2006**

---

[37]The Commissioner asserts that the ALJ properly compared Plaintiff's statement that he could not sit for forty-five minutes at a time with his ability to sit through the two hour administrative hearing. (Def.'s Mem. at 15). This assertion, however, is unavailing because "[m]any courts have condemned the 'sit and squirm' test, and we are uncomfortable with it as well." *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000)(citations omitted). The Seventh Circuit noted further in *Powers* that "[w]e doubt the probative value of any evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort." *Id.* (Emphasis in original).